STATE OF NEBRASKA, APPELLEE, V. JAMES F. CODY, APPELLANT.
539 N.W.2d 18

Filed October 27, 1995.   No. S-94-109.

Toney J. Redman for appellant.

Don Stenberg, Attorney General, and James A. Elworth for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

CAPORALE, J.

## I. INTRODUCTION

Pursuant to verdict, defendant–appellant, James F. Cody, was adjudged guilty of possessing with the intent to deliver a controlled substance, marijuana, in violation of Neb. Rev. Stat. §§ 28–405(c)(10) [Schedule I] and 28–416(1)(a) (Cum. Supp. 1992). He thereupon appealed to the Nebraska Court of Appeals, asserting the district court erred in failing to find that he had standing to challenge the search at which certain evidence was seized. Cody also asserted that he was denied the effective assistance of trial counsel. Determining as a matter of plain error that the evidence was insufficient to support the conviction, the Court of Appeals, without reaching Cody's claims, reversed the judgment of the district court and remanded the cause with the direction that it be dismissed. *State v. Cody*, 95 NCA No. 16, case No. A–94–109 (not designated for permanent publication). The plaintiff–appellee State, challenging the Court of Appeals' conclusion that the evidence ·was insufficient, successfully petitioned for further review by this court. We now reverse the judgment of the Court of Appeals and remand the cause with the direction that it affirm the judgment of the district court.

## II. FACTS

Cody's mother, Frances Cody, owned a ranch in Sheridan County, Nebraska. Because she was away during the summer and fall of 1992 taking care of her injured daughter and returned to the ranch only infrequently during this time, Cody cared for the "two old dogs" and a cat she kept there as pets.

During an October 12, 1992, visit to the ranch, the mother went into a shed that served as a garage and a stable to get a pail. Upon entering, she discovered a pile of marijuana spread out on top of a blue plastic tarpaulin. When she found the pail

she had originally gone to retrieve, she discovered that it also contained marijuana.

This was not the first time the mother had found marijuana on her property. In both 1990 and 1991, she had called the Alliance Police Department to report some wild marijuana growing at the ranch. After finding the marijuana in the shed on this occasion, she reported it to the police department. Alliance police officer David Lehman responded to the mother's call and went to the ranch to investigate.

Lehman testified that the mother took him to the shed where a large amount of a substance thought to be marijuana was found inside a blue tarp which itself was placed into a white bucket. Lehman also found a wheelbarrow with traces of marijuana inside it, a large double-beam scale with a "lick tub" for cattle on top of it, a large machete, and two empty beer cans. There were several empty dog food and cat food bags in the tack area of the shed, along with a barrel filled with pet food. Lehman searched the stable area and behind a large piece of cardboard found two Lewin Norco lick tubs and a large black trash bag, all of which contained marijuana. Lehman confiscated these items.

Lehman further testified that the marijuana in the lick tubs and in the trash bag had been "manicured," a process by which the leaves and buds of the plants are removed from the stems and the material then dried and ground. He testified that the marijuana in the lick tubs had been there in excess of 2 weeks and that the other marijuana inside the shed had been there for only a few days. Lehman did not comment as to how long the marijuana had been in the trash bag.

A large patch of marijuana was discovered by Lehman growing about 75 to 100 yards north of the shed. The marijuana patch contained approximately 1,000 stripped marijuana plant stems that were still in the ground. Lehman estimated that each plant was capable of yielding about three-quarters of a pound of marijuana. There was a footpath which led around the marijuana patch and also a vehicle path that ran toward the shed.

While Lehman was conducting his investigation, Cody went to his mother's ranch to return a vacuum cleaner. However,

Lehman did not interview Cody until the next day, October 13, 1992, at which time Cody admitted that he was experiencing financial problems and acknowledged that he smoked several brands of cigarettes, including Marlboro Lights, generic brands, and Montclair 100's. Cody told Lehman that he had been taking care of the pets at the ranch while his mother was away and that he stayed at the ranch "maybe once or twice a week." Cody also told Lehman that he worked at the Lewin Norco Feed Mill in Alliance.

During the course of the investigation, Lehman confiscated several cigarette butts. He found one Marlboro Light cigarette butt in the shed near the tack area. A Montclair cigarette butt was recovered from the footpath area near the edge of the marijuana patch. An assortment of Marlboro Light, Montclair, and other brands of cigarette butts was recovered from the room at the ranch where Cody occasionally stayed.

Later chemical analysis of the substance found in the two lick tubs, the trash bag, and the blue tarp confirmed that it was marijuana. Several of the confiscated items were also examined for fingerprints. The latent prints found on the two beer cans and on the two lick tubs were insufficient for comparison purposes. Of the six latent prints on the confiscated trash bag, four matched Cody's fingerprints; the other two prints were insufficient for comparison purposes.

At the suppression hearing, two deeds to the mother's ranch were received in evidence. The first showed title to be in the mother, subject to a life estate in her father. The second showed that on October 20, 1992, a week after Lehman had searched the ranch, the mother transferred an undivided half interest in some of the property to Cody's brother and sister.

Lehman, called as a witness by Cody's trial counsel, testified that he was a police officer for the city of Alliance and that on October 12, 1992, he went to the ranch and seized the marijuana. Lehman further testified that he knew Cody lived in Alliance and that Cody stayed at the ranch once or twice a week.

Lehman indicated that several other police officers were at the Cody ranch with him on October 12, 1992, namely, a Detective McDaniel, who was also from the Alliance Police

Department; Officer Mark Overman from the Scottsbluff Police Department; and Det. Robert Greer from the Gering Police Department. None of the officers were state deputy sheriffs or members of the Nebraska State Patrol. Neither were any of them sheriffs or deputy sheriffs of Sheridan County. Lehman stated that his own jurisdiction was not really clear, but for the most part it was the city of Alliance and Box Butte County. There is no dispute that the Cody ranch is located approximately 18 miles east and 1 mile north of Alliance in Sheridan County.

After Lehman had testified, the State asserted that the district court did not have jurisdiction to hear the merits of Cody's motion because Cody lacked standing to challenge the search of the ranch. Cody's trial counsel disagreed, arguing that the mere fact that Cody stayed at the ranch one or two nights a week was enough to confer standing. Cody's trial counsel further urged that the officers did not have the authority to be in Sheridan County supervising police or law enforcement functions on October 12, 1992. The district court determined that Cody did not have standing to contest the search of the ranch and dismissed his motion to suppress.

At the trial on November 17, 1993, Cody presented evidence that he was not the only one with access to the ranch. Edward Dentler, a rancher who had been leasing part of the ranch property, testified that he put up hay on the property and kept cattle there from September of each year until calving time the following February. Dentler further testified that at times, he had used the shed to store feed, salt, minerals, and other materials, but that he had not been in the shed in October 1992.

According to Dentler, the marijuana on the Cody ranch began growing when a previous tenant had purchased hay from Burwell. The marijuana grew in the area where the hay had been scattered for the cattle to eat.

Dentler testified that he did not smoke cigarettes, but that his wife smoked Marlboros. Dentler further testified that his wife, who worked with Dentler every day tending to his cattle, was in the habit of putting out her cigarettes on the ground and leaving the butts there.

Mardella McFall, a neighbor to the ranch, was also called as

a witness by Cody's trial counsel. She testified that she saw strange automobiles going up the road to the Cody ranch. On cross-examination, McFall testified that "one was a dark colored car either black or navy blue" and the "other one was a tan older station wagon." However, she admitted that she was unsure when she had seen these vehicles; she could only say that it was during the summertime. McFall never saw the vehicles on the ranch itself.

## III. ANALYSIS

Our analysis considers first, the State's claim that, contrary to the ruling of the Court of Appeals, the evidence is sufficient to support the conviction; second, Cody's claim that the district court erred in concluding he did not have standing to challenge the validity of the search; and third, Cody's claim that his trial counsel was ineffective.

### 1. SUFFICIENCY OF EVIDENCE

#### (a) Scope of Review

In *State v. Pierce, ante* p. 536, 537 N.W.2d 323 (1995), decided after the Court of Appeals ruled in this case, we held that regardless of whether the evidence is direct, circumstantial, or a combination thereof, an appellate court, in reviewing a criminal conviction, does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. See, also, *State v. One 1985 Mercedes 190D Automobile*, 247 Neb. 335, 526 N.W.2d 657 (1995); *State v. Hirsch*, 245 Neb. 31, 511 N.W.2d 69 (1994); *State v. Russell*, 243 Neb. 106, 497 N.W.2d 393 (1993); *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981).

#### (b) Application of Law to Record

*Pierce* thus mandates that in reviewing a conviction, all evidence, whether direct or circumstantial, be viewed by an appellate court in the light most favorable to the State.

It is undisputed that during the summer and fall of 1992, the

mother was away from the ranch, and that during the time that she was away, Cody was the only one known to be on the ranch.

It was his job to take care of the pets on the ranch. In the shed where the pet food was stored, a large amount of marijuana was found lying on a blue tarp. Nearby was a machete, a wheelbarrow, and a double–beam scale. Lehman's testimony established that these items were suitable for harvesting and processing marijuana. The machete was suitable for chopping down marijuana plants, and the wheelbarrow, which in fact did contain some traces of marijuana, could be used to haul the marijuana from the patch to the shed. In addition, the double–beam scale could easily be put to use weighing amounts of marijuana. Also discovered inside the shed were two Lewin Norco lick tubs and a large black trash bag, all of which were full of manicured marijuana. Such a large amount of marijuana supports an inference that it was intended for further sale.

There were a number of pieces of evidence that tied Cody to the marijuana found in the shed. One of the lick tubs full of marijuana found in the shed was from the Lewin Norco Feed Mill. Cigarette butts found in the shed and on the footpath near the marijuana patch matched the cigarette brands Cody smoked. Perhaps most damning of all, four of Cody's fingerprints were found on the black trash bag full of marijuana. There was also evidence that Cody may have been motivated to harvest the marijuana because he was experiencing financial problems.

## (c) Resolution

Viewed in the light most favorable to the State, the evidence is sufficient to sustain Cody's conviction, and the Court of Appeals erred in ruling otherwise.

## 2. STANDING TO CHALLENGE SEARCH

That conclusion leads us to a consideration of the assignments of error Cody made which the Court of Appeals did not reach. The first is Cody's claim that the district court incorrectly ruled that he did not have standing to challenge the search of the ranch.

## (a) Scope of Review

That claim presents a question of law, in connection with

which a reviewing court has an obligation to reach a conclusion independent of that of the inferior court. *State v. Cox*, 247 Neb. 729, 529 N.W.2d 795 (1995). See, also, *McPherrin v. Conrad, ante* p. 561, 537 N.W.2d 498 (1995).

### (b) Application of Law to Record

It has long been the rule that in a criminal trial, after a pretrial hearing and order denying a defendant's motion to suppress, the defendant must object at trial to admission of the evidence which was the subject of the suppression motion in order to preserve an appellate question concerning admissibility of that evidence. *State v. Salamon*, 241 Neb. 878, 491 N.W.2d 690 (1992); *State v. Rodgers*, 237 Neb. 506, 466 N.W.2d 537 (1991); *State v. Roggenkamp*, 224 Neb. 914, 402 N.W.2d 682 (1987); *State v. Pointer*, 224 Neb. 892, 402 N.W.2d 268 (1987).

### (c) Resolution

Because a review of the record establishes that Cody's trial counsel failed to object at trial to the admission of the evidence that was the subject of the suppression hearing, the matter of the district court's denial of the suppression motion is an issue in this appeal only as it becomes part of the following analysis of Cody's claim that his trial counsel was ineffective.

### 3. EFFECTIVENESS OF TRIAL COUNSEL

Cody claims that he was denied effective assistance of trial counsel because trial counsel failed at the suppression hearing to establish all the possible grounds for suppressing the evidence seized from the ranch and failed to object to the introduction of such evidence at trial, failed to move to suppress Cody's statements, and failed to move to suppress Cody's fingerprint identification.

### (a) Scope of Review

To sustain a claim of ineffective assistance of counsel as a violation of the Sixth Amendment to the U.S. Constitution, a defendant must show that counsel's performance was deficient and that such deficient performance prejudiced the defense, that is, demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have

been different. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Clausen*, 247 Neb. 309, 527 N.W.2d 609 (1995); *State v. Dawn*, 246 Neb. 384, 519 N.W.2d 249 (1994).

### (b) Application of Law to Record

We note that Cody's claim that trial counsel was ineffective is being made on direct appeal; however, such a claim need not necessarily be dismissed merely because it is made in such an appeal. The determining factor is whether the record is sufficient to adequately review the question. *State v. Dawn, supra*; *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991). When the issue has not been raised or ruled on at the trial level and the matter necessitates an evidentiary hearing, an appellate court will not address the matter on direct appeal. *State v. Dawn, supra*; *State v. Morley, supra*; *State v. Dixon*, 223 Neb. 316, 389 N.W.2d 307 (1986).

### (i) Challenge of Search and Objection to Evidence

As noted earlier, Cody first argues that trial counsel was deficient by not presenting all available evidence to establish standing to challenge the search and seizure and by failing to object to the introduction of the seized evidence.

We observe at the outset that the use of a "standing" analysis is not particularly helpful in resolving search and seizure questions under the Fourth Amendment, notwithstanding our comprehensive treatment of such in *State v. Baltimore*, 242 Neb. 562, 495 N.W.2d 921 (1993). According to *Baltimore*, " '[s]tanding' means that a person has a sufficient legally protectable interest which may be affected in a justiciable controversy, entitling that person to judicial resolution of the controversy." *Id*. at 568, 495 N.W.2d at 925. Standing also "relates to jurisdiction and prudential considerations regarding exercise of jurisdiction." *Id*. at 568, 495 N.W.2d at 926.

> As an aspect of jurisdiction and justiciability, standing requires that a litigant have such a personal stake in the outcome of a controversy as to warrant invocation of a court's jurisdiction and justify exercise of the court's remedial powers on the litigant's behalf. . . . Thus,

generally, a litigant must assert the litigant's own legal rights and interests, and cannot rest a claim on the legal rights or interests of third parties.

*Id.* at 568–69, 495 N.W.2d at 926.

However, the U.S. Supreme Court in *Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), questioned whether it serves any useful analytical purpose to consider the matter of standing distinct from the merits of a defendant's Fourth Amendment claim. According to *Rakas*, the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate but invariably intertwined concept of standing. Analyzed in these terms, "standing" is nothing more than an inquiry into whether the disputed search and seizure has infringed an interest of the defendant in violation of the protection afforded by the Fourth Amendment.

In urging that the search and seizure here infringed such rights, Cody argues that trial counsel focused almost entirely on whether the officers conducting the search were out of their jurisdiction and whether that jurisdictional question rendered the search and subsequent seizure illegal. The only evidence offered at the suppression hearing to support Cody's claim in that regard was statements elicited from Lehman that Cody had told him "he was going out to the ranch once in a while [sic] his mother was watching an injured sister" and that Cody stayed out at the ranch "maybe once or twice a week."

Cody asserts that counsel's performance was deficient for not producing at the suppression hearing the evidence adduced at trial that his mother visited the ranch infrequently during the approximately 6 months prior to the search; Cody had his own room in the house at the ranch; during the mother's absence, Cody took care of the pets and occasionally spent the night at the residence; on October 12, 1992, the mother found a large quantity of marijuana on the floor of her shed; the mother requested that Lehman and other officers come to the ranch where they found large amounts of marijuana in various places within the shed; and the mother showed the officers the room where Cody slept, from which the officers seized cigarette butts.

Initially, it must be noted that, contrary to Cody's assertion, the mother did not testify that Cody had his own room in the house at the ranch. She merely testified that there was a particular bedroom in the house in which he slept. She at no point indicated that it was "his" room.

With that slight modification, we accept that the trial evidence establishes what Cody says it does. Given those facts, the test is whether Cody had a legitimate expectation of privacy in the invaded place. See *Minnesota v. Olson*, 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990). A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable. *Id.*

Courts consider many factors in determining whether a defendant has a legitimate expectation of privacy. One of the most comprehensive lists of these factors was articulated in *U.S. v. Abreu*, 730 F. Supp. 1018, 1026 (D. Colo. 1990), in which the court stated:

> Property ownership is one factor to consider in determining whether a defendant has a reasonable expectation of privacy. [Citation omitted.] Other factors include the nature of the place searched, [citations omitted], whether the defendant had a possessory interest in the thing seized or the place searched, whether the defendant had a right to exclude others from that place, whether the defendant exhibited a subjective expectation that the place would remain free from governmental intrusion, whether the defendant took precautions to maintain privacy, and whether the defendant was legitimately on or in possession of the premises searched.

In applying these criteria, it is important to remember that the existence of a privacy right sufficient to entitle one to contest a search of one location does not necessarily imply such a right with respect to another location. Because of this, we have adopted a principle of severability which permits a court to address specific locations in which a defendant has standing to challenge and disregards those locations which a defendant does not. *State v. Stott*, 243 Neb. 967, 503 N.W. 822 (1993). In the present case, there were three areas searched by the officers: the marijuana patch, the shed, and a room in the house located on

695

the ranch where Cody would occasionally sleep. A separate analysis of Cody's capacity to claim the protection of the Fourth Amendment is required for each location.

The facts upon which Cody relies do not establish that he had a legitimate expectation of privacy in the marijuana patch. The marijuana patch is subject to the open fields doctrine that was first articulated in *Hester v. United States*, 265 U.S. 57, 59, 44 S. Ct. 445, 68 L. Ed. 898 (1924): "[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields." This decision was later reaffirmed in *Oliver v. United States*, 466 U.S. 170, 179, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984), where the Court said: "[O]pen fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance." We have concluded that the Nebraska Constitution provides no greater protection in this regard than does the U.S. Constitution. *State v. Havlat*, 222 Neb. 554, 385 N.W.2d 436 (1986).

Neither do the trial facts emphasized by Cody establish that he had a privacy right in the shed. Although he was legitimately on the premises taking care of his mother's pets, a greater number of the factors articulated in *U.S. v. Abreu, supra*, weigh against him. Cody had no property interest in the shed at the time of the search, nor is there any indication that he took any precautions to ensure that the contents of the shed would remain private. In fact, the evidence shows that no precautions were taken. The mother testified that the buildings on the ranch, including the shed, were left unlocked. Dentler, the rancher who rented part of the ranch, testified that during his lease, he had never found the shed locked. Moreover, Dentler testified that he had free access to the shed to store materials as a part of his lease. Thus, Cody could not have had a subjective expectation of privacy that society would recognize as reasonable.

Left remaining is the question as to whether the trial facts emphasized by Cody establish his right to contest the search of the room in which he stayed. At the suppression hearing, the evidence showed that although Cody had no title interest in the

ranch, he stayed overnight in a particular bedroom maybe once or twice a week while his mother was away and had responsibility for taking care of his mother's pets. Cody does not claim the trial evidence shows he was an overnight guest at the time of the search and seizure.

Relying on *Minnesota v. Olson*, 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990), we, in *State v. Walker*, 236 Neb. 155, 459 N.W.2d 527 (1990), held that an individual's status as an overnight guest is alone enough to show that he or she has a legitimate expectation of privacy in the premises which is protected by the Fourth Amendment, and, thus, the person has standing. However, we later modified that broad view in *State v. Cortis*, 237 Neb. 97, 465 N.W.2d 132 (1991), *denial of habeas corpus aff'd, Cortis v. Kenney*, 995 F.2d 838 (8th Cir. 1993). We therein held that the defendant did not have such an expectation of privacy in a friend's home which society was prepared to recognize as reasonable even though he had stayed at the home overnight a couple of times, but was not an overnight guest at the time of the police intrusion. We there recognized that in order to have a protected Fourth Amendment interest as an overnight guest at searched premises, one must have been such a guest at the time of the search, noting that "[a]ny other conclusion would result in an overnight guest's having a permanently protected fourth amendment interest in a place in which he or she once stayed, no matter how remote in time." *State v. Cortis*, 237 Neb. at 104, 465 N.W.2d at 139.

Thus, even the trial evidence fails to establish that Cody had a reasonable expectation of privacy anywhere on the ranch.

### (ii) Suppression of Statements

Cody next contends that Lehman's trial testimony that Cody was advised of his *Miranda* rights but did not waive them required that trial counsel move to suppress the statements he made.

*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements stemming from the custodial interrogation of a defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the privilege against self–incrimination. *State*

*v. Brunzo, ante* p. 176, 532 N.W.2d 296 (1995); *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993). For purposes of the *Miranda* rule, a custodial interrogation takes place when questioning is initiated by law enforcement officers after one has been taken into custody or is otherwise deprived of one's freedom of action in any significant way. *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977); *State v. Brunzo, supra.*

It must first be noted that the evidence as to whether Cody waived his *Miranda* rights is in conflict. During direct examination at trial, Lehman testified that such rights "were read to . . . Cody prior" to his being interviewed on October 13. When asked whether Cody agreed to "speak with" Lehman on that date, Lehman responded in the affirmative. During cross-examination, Lehman confirmed that Cody "was given" his *Miranda* rights, but when asked whether Cody "waived those rights and agreed to talk with" Lehman, Lehman answered in the negative. While on the record presented it was for the jury to resolve the conflict, see *Brandt v. Leon Plastics, Inc.*, 240 Neb. 517, 483 N.W.2d 523 (1992), and *Doggett v. Brunswick Corp.*, 217 Neb. 166, 347 N.W.2d 877 (1984) (in absence of bad faith motive, conflict in same expert's testimony was for trier of fact to resolve), the legal reality is that whether Cody waived those rights is immaterial.

That is so because the record establishes that Cody was not in custody at the time he made the statements. He voluntarily went to the Alliance Police Department to be interviewed. The officers did not in any way threaten or force Cody to speak with them, and the record does not establish that Cody was other than free to leave at any time. We have held:

Police officers are not required to administer *Miranda* warnings to everyone whom they question, or simply because the questioning takes place in a police station, or because the questioned person is one whom the police suspect. [Citation omitted.] Rather, *Miranda* warnings are required only where there has been such a restriction on one's freedom as to render one "in custody." [Citation omitted.]

One is in custody for *Miranda* purposes when there is

a formal arrest or a restraint on one's freedom of movement of the degree associated with such an arrest.

*State v. Brunzo, ante* at 187, 532 N.W.2d at 305. Accord, *State v. Bronson, supra*; *State v. Victor*, 235 Neb. 770, 457 N.W.2d 431 (1990), *cert. denied* 498 U.S. 1127, 111 S. Ct. 1091, 112 L. Ed. 2d 1195 (1991).

Consequently, there was no requirement that Cody be given the *Miranda* warnings.

However, Cody also claims the statements should have been suppressed because Lehman did not have the authority to question him. Cody argues that because Lehman did not have jurisdiction to search the ranch, any questions that Lehman asked were asked as a " 'private citizen' " under " 'color of law.' " Brief for appellant at 10. Cody maintains that such information gathered by a private citizen acting under color of law is subject to suppression. In support of this theory, Cody cites a variety of cases from various jurisdictions. E.g., *Phipps v. State*, 841 P.2d 591 (Okla. Crim. App. 1992); *Wilson v. State*, 403 So. 2d 982 (Fla. App. 1980); *People v. Martin*, 225 Cal. App. 2d 91, 36 Cal. Rptr. 924 (1964).

Even assuming arguendo that Cody's theory is sound, a matter we do not decide, this case does not fit the fact pattern found in the cited cases. In all of the foregoing cases, it was the law enforcement officer who, while outside the officer's jurisdiction, initiated the contact with a citizen. In this case, it was Cody's mother who initiated the contact with Lehman and the Alliance Police Department, and Cody made the statements while at the police department where Lehman did in fact have jurisdiction.

Therefore, the record provides no basis on which it can be said Cody's statements were to be suppressed.

### (iii) Fingerprint Identification

As his final allegation of deficient performance, Cody claims that trial counsel was deficient in not attempting to suppress the fingerprint identification on the ground that Lehman did not have the authority to request such as Lehman did not have jurisdiction in the case and was acting as a private citizen under color of law.

The immediately preceding analysis of the jurisdictional issue with respect to Cody's statements disposes of this claim as well; there is no basis on which to suppress the fingerprint evidence.

## (c) Resolution

Thus, it is apparent that even if trial counsel's performance was deficient in each of the particulars claimed by Cody, those deficiencies did not prejudice Cody.

That being so, there is no merit to Cody's claim of ineffective assistance of trial counsel.

## IV. JUDGMENT

For the foregoing reasons, the judgment of the Court of Appeals is, as first noted in part I, reversed and the cause remanded with the direction that the Court of Appeals affirm the judgment of the district court.

REVERSED AND REMANDED WITH DIRECTION.