STATE OF NEBRASKA, APPELLEE, V.
CHERYL ZIEMANN, APPELLANT

705 N.W.2d 59

Filed October 18, 2005.    No. A-04-1483.

Jeffrey H. Bush for appellant.

Jon Bruning, Attorney General, and Kevin J. Slimp for appellee.

SIEVERS, CARLSON, and CASSEL, Judges.

SIEVERS, Judge.

Cheryl Ziemann (Cheryl) appeals the decision of the district court for Thurston County affirming the decision of the county court. The county court convicted Cheryl of one count of cruelty to animals, a Class I misdemeanor, and two counts of animal neglect, each a Class II misdemeanor.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 8, 2003, Thurston County Sheriff Charles Obermeyer received information from an electrician who had been working at a farmstead located between Walthill and Pender regarding

two horses which appeared to be without food or water. Sheriff Obermeyer and two deputies went to the farmstead. Upon arrival, Sheriff Obermeyer found that the farmstead appeared to be abandoned and that two horses were located in a grove of trees behind the house. One of the horses was tethered, and it appeared the other horse had broken free. (The two horses were later identified by Cheryl as "Ace," a male horse, and "Moon," a female horse, and we will use their names hereinafter.) Sheriff Obermeyer observed that the horses were without water, that there was no grass within reach of the horses, and that Ace's leg had a cut that was bleeding and oozing pus. The horses appeared very thin, with their ribs visible. Sheriff Obermeyer and the deputies got water for the horses, and Sheriff Obermeyer contacted the jailer for Thurston County, Larry Lown, who had experience caring for horses. Because of the condition of the horses, they were impounded and taken to Lown's farm so that they could receive proper care. Lown provided food and water for the horses and followed veterinary instructions concerning the care of the infected cut on Ace's leg. Cheryl eventually telephoned Sheriff Obermeyer and identified herself as the owner of Ace and Moon.

On July 9, 2003, Sheriff Obermeyer went to David Hunter's residence and observed "the balance of" the horses that were said to be the property of Cheryl and Sheriff Obermeyer took possession of four more horses, as well as a fifth horse on the following day.

The State filed a complaint against Cheryl on August 1, 2003, charging her with one count of cruelty to animals and six counts of animal neglect. At Cheryl's arraignment on August 25, she pled not guilty to all seven counts.

On January 5, 2004, Cheryl filed a "Motion to Suppress Physical Evidence." In Cheryl's motion, she alleged that all "items of evidence were taken from [her] or other area in which she had an expectation of privacy without any valid or legal consent to search" and that "[t]here existed no probable cause for the search or seizure of any of said evidence." Cheryl also filed a motion to quash, alleging that the complaint was defective on its face because it designated all seven counts as Class I misdemeanors, when, by statute, they were Class II misdemeanors.

At Cheryl's January 15, 2004, arraignment on the amended complaint, which complaint cured the defects named in the motion to quash, Cheryl pled not guilty to all seven counts. Also on January 15, a hearing was held on Cheryl's motion to suppress. At that hearing, Sheriff Obermeyer testified that on July 8, 2003, an electrician advised him that two horses were on an abandoned farmstead and that they were in "bad . . . shape." When Sheriff Obermeyer arrived, he found the horses were tied up behind the house, by a grain bin in a small grove of trees. Sheriff Obermeyer observed that there was no grass within the reach of the horses, that they had eaten all the grass they could reach, and that there was no water. Sheriff Obermeyer testified that Ace was bleeding from the leg and that the leg looked infected.

Sheriff Obermeyer testified that after making several telephone calls, he found out that the horses might belong to Cheryl, but that his attempts to contact her were unsuccessful. However, Cheryl ultimately called him back and wanted to know what right he had to take her horses.

Sheriff Obermeyer related that he talked to Cindy Rarrat, the owner and operator of Sioux City Animal Control, who advised him that she was already working with a situation involving a horse belonging to Cheryl. Sheriff Obermeyer recounted that during his investigation, he discovered that Cheryl had other horses at Hunter's place, and that on July 9, 2003, Sheriff Obermeyer seized from there four horses that appeared neglected and underfed. He also seized a fifth horse on July 10. Sheriff Obermeyer testified that he did not think he needed to obtain a warrant to seize the horses because he had permission from Hunter and because it was an emergency situation.

Rarrat testified that on June 23, 2003, she received a call from Hunter, who said he could not care for a horse in dire shape he had obtained from Cheryl. Rarrat testified that Hunter brought the horse, named "Dee," to her. Rarrat testified that Dee had lice, maggots, and an infection and was given food, water, and anti - biotics. Rarrat testified that the veterinarians graded Dee a "one" and that they would have graded Dee a "zero," but there was not such an option on their chart. The evidence was that the American Humane Association rates the condition of horses on a scale from one to nine, with one being the worst possible condition and nine

being a horse that is extremely overweight, and that a rating of five or six would indicate a healthy horse. Rarrat said that Hunter allowed Rarrat and Sheriff Obermeyer onto the property and that Hunter signed a release form regarding every animal that was removed from the property.

The county court's order overruling Cheryl's motion was filed on February 20, 2004. The court found that Cheryl failed to establish that she had standing to challenge the search, that Cheryl had no reasonable expectation of privacy that attached to any of the locations of any of the horses, that a search warrant was not required by statute in this case, and that the warrantless search and subsequent seizure of horses found on Hunter's premises were justified by Hunter's consent to such search. Moreover, the court found that at both Hunter's place and the abandoned homestead, the officer had the right to be in the position where he had plain view.

A jury trial was held on May 6 and 7, 2004. At the time of trial, counts IV through VII had been dropped. The only charges remaining were count I (Dee) and counts II and III (Ace and Moon).

Sheriff Obermeyer's trial testimony was not materially different than his testimony at the suppression hearing, and therefore, we do not repeat it except as to new matter. Sheriff Obermeyer testified that Cheryl called him and claimed the horses. He testified that he told Cheryl the horses were in bad shape and that he thought about shooting them but he "didn't have the heart to shoot horses." Sheriff Obermeyer testified that Cheryl responded that if she had known he would have shot the horses, she would have let him shoot the horses for her. Sheriff Obermeyer testified that at that point, he advised Cheryl that he could not talk to her any more without advising her of her *Miranda* rights.

Lown, the county jailer, testified that he was called to the farmstead on July 8, 2003, to help with Ace and Moon. Lown testified that when he arrived, the two horses did not look good, and that when given water, the horses consumed 15 to 20 gallons in 5 to 10 minutes. Lown testified that Ace had an injured leg that probably had occurred within the prior 2 days. Lown testified that he took Ace and Moon to his place and started administering veterinary care. Lown testified that on July 8, he thought

the horses, especially Ace, would die. Lown testified that Ace and Moon have remained at his place since July 8.

Hunter testified that he agreed to watch one horse, Dee, for Cheryl for a weekend for approximately $90 and that he was to provide food and medication for the horse. Hunter said that Dee had a swollen leg and a hole in its stomach and that he had to pick the horse up so that it could digest food, because the horse would not get up on its own. Hunter was worried about Dee's life and called a veterinarian, who told him the horse should be "put to sleep." Hunter testified that he did not do that because Dee was not his horse. Hunter said that he called Rarrat and took Dee to her at the Siouxland Animal Rescue League (Siouxland Rescue). Hunter testified that he was keeping seven horses for Cheryl's daughter and that the people from Siouxland Rescue took those horses as well.

Rarrat testified that in addition to owning and operating the Sioux City Animal Control Center, she is also a volunteer and board member for Siouxland Rescue. Rarrat confirmed that Hunter had contacted her and later brought the horse to her in "horrific" condition, and she stated that "[i]t was the most unbelievable case I've ever seen." Rarrat testified that Dee's hair was falling out and that Dee was skin over bones, was very weak, had sores all over her body, had a swollen leg, had maggots around infected areas, and had lice. Although Rarrat treated Dee with antibiotics, cold packs, and Epsom salts, Dee was eventually euthanized. Rarrat said that she saw Ace and Moon on July 9, 2003, and that they were also in bad shape.

Cheryl's motion to dismiss at the conclusion of the State's case was denied, and she does not assign error to such ruling; nor does she contend that the evidence was insufficient to sustain the conviction. Thus, while Cheryl introduced evidence purporting to show that the horses were not neglected or abused by her, we need not recount that evidence because under our standard of review of a jury verdict, we view the evidence in the light most favorable to the State, see *State v. Cisneros*, 248 Neb. 372, 535 N.W.2d 703 (1995), and in such light, the evidence is obviously sufficient to sustain the convictions for one count of cruelty to animals and two counts of animal neglect. The court's journal entry reflecting such conviction was filed on May 12, 2004.

A sentencing hearing was held on July 8, 2004, at which Cheryl testified that she was 55 years old and had received $599 per month in disability since February 2004. Cheryl said that she also filed for chapter 13 bankruptcy in February 2004, resulting in a 5-year plan under which she pays $300 per month. Cheryl testified that she is purchasing an acreage at a cost of $1,015 per month, which payment she makes with her mother's help. Cheryl said that the Siouxland Rescue bill for $1,681 included services for horses she did not own because the other horses were owned by her daughter. The presentence investigation report also includes a bill from Lown for $1,003.47. Neither Lown nor anyone from Siouxland Rescue testified about their expenditures which resulted in those bills.

The trial judge noted that in determining Cheryl's sentence, he considered that he had sat through the trial, observed the witnesses, and reviewed the presentence investigation report. The judge also noted that in 1991, Cheryl was convicted of 11 counts of similar types of crimes involving puppies and kittens. (The presentence investigation report reflects that Cheryl was convicted of 11 counts of cruelty to animals, was placed on probation for 2 years, and was ordered not to have more than one dog and one cat on her property during the probation period.) The judge thought it appeared likely that Cheryl would commit a similar crime in the future. The judge noted that he had considered Cheryl's family situation—Cheryl has a daughter who was 12 years old and still lived at home, but the child had her father to care for her. The judge found that probation was not an appropriate sentence and that a lesser sentence than incarceration would depreciate the seriousness of the crime and would promote disrespect for the law. The county court sentenced Cheryl to 240 days in jail for the cruelty conviction and 90 days in jail for each of the two neglect convictions, with the sentences to be served consecutively. The court ordered her to pay court costs of $131.47 and to cooperate as needed to execute all documents necessary to transfer ownership of the two horses which were the subjects of the neglect convictions, since they were to be placed for adoption. The court also ordered Cheryl to pay restitution to Siouxland Rescue and to Lown in the total amount of $2,112.27, although the judge also stated in reference to the

amount, "it may be inaccurate, I'm doing it rather quickly here, to be paid within three years after the release from incarceration." The court's journal entry dated July 8, 2004, reflected the jail sentences imposed at the hearing, but showed that Cheryl was to pay a different amount—$1,202.27—for the benefit of Siouxland Rescue and Lown.

On July 8, 2004, Cheryl filed her "Notice of Intention to Prosecute Appeal" to the district court for Thurston County. On July 15, the county court entered a nunc pro tunc order which stated that "due to [a] scrivener's error while calculating the expenses incurred in th[is] matter during the sentencing hearing of July 8, 2004, the correct total amount of restitution to be paid by [Cheryl] is $1,889.27; $885.80 to Siouxland . . . Rescue . . . and $1,003.47 to . . . Lown." Why or how the court ordered Siouxland Rescue to be paid $885.80 when the bill was $1,681 is not explained, nor is it apparent from the record.

An appeal hearing was held before the district court on September 14, 2004, and in an order filed November 30, 2004, the district court affirmed the county court's denial of Cheryl's motion to suppress and affirmed Cheryl's jail sentences. The district court did, however, vacate the county court's nunc pro tunc order dated July 15, 2004, finding that at the time such order was entered, jurisdiction of the case was vested in the district court because Cheryl had already filed a notice of appeal. Cheryl now appeals to this court.

## ASSIGNMENTS OF ERROR

Cheryl alleges that the county court erred in (1) overruling her motion to suppress, (2) admitting at the jury trial evidence which should have been excluded, (3) changing the amount of restitution by written order nunc pro tunc after the judge had announced it in open court, (4) imposing jail sentences which were excessive, (5) ordering restitution which was erroneous and excessive, and (6) imposing restitution on her when it was clear she lacked the means to pay restitution.

## STANDARD OF REVIEW

■ A trial court's ruling on a motion to suppress based on the Fourth Amendment, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to

perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Allen*, 269 Neb. 69, 690 N.W.2d 582 (2005).

A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Banes*, 268 Neb. 805, 688 N.W.2d 594 (2004). An abuse of discretion in imposing a sentence occurs when a sentencing court's reasons or rulings are clearly untenable and unfairly deprive the litigant of a substantial right and a just result. *Id.*

Interpretation of a statute presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *Id.*

## ANALYSIS

*Motion to Suppress.*

Cheryl argues that the county court erred in overruling her motion to suppress. We will address the motion to suppress only as it relates to Dee, Ace, and Moon, the horses involved in counts I, II, and III, upon which Cheryl was convicted. The seizure of the other horses is moot because Cheryl was not convicted of any crimes relating to those four horses and because no evidence concerning those horses was presented at trial.

Cheryl's motion to suppress related to the seizure of horses on July 8, 9, and 10, 2003, from the farmstead and Hunter's property. Dee was surrendered to Siouxland Rescue by Hunter on June 23; thus, Dee was not seized by the State, nor was the State involved in Hunter's transfer of the horse to Siouxland Rescue. Therefore, Cheryl's argument for suppression in regard to Dee is without merit.

We turn to the suppression motion as it relates to Ace and Moon, the two horses seized from the farmstead on July 8, 2003. The Fourth Amendment to the U.S. Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

However, in *Rakas v. Illinois*, 439 U.S. 128, 133-34, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), the U.S. Supreme Court stated:

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." [Citations omitted.] A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. [Citation omitted.] And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, [citation omitted], it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

In *State v. Konfrst*, 251 Neb. 214, 224, 556 N.W.2d 250, 259 (1996), the Nebraska Supreme Court stated:

A "standing" analysis in the context of search and seizure is nothing more than an inquiry into whether the disputed search and seizure has infringed an interest of the defendant in violation of the protection afforded by the Fourth Amendment. *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995). See, also, Neb. Rev. Stat. § 29-822 (Reissue 1995). The test used to determine if a defendant has an interest protected by the Fourth Amendment is whether the defendant has a "legitimate expectation of privacy in the premises."

Cheryl does not own or reside at the farmstead where her two horses were seized. Cheryl bases her claim of a "legitimate expectation of privacy in the premises" on the fact that she leased the grass area on the farmstead for a dollar—although she did not establish whether this was per day, week, month, or year. And, the only evidence that any such lease existed is Cheryl's testimony. But, assuming there was such a lease, Cheryl was leasing only open land, which is subject to the open fields exception to the warrant requirement. Under the open fields doctrine, " '[o]pen fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance.' " *State v. Cody*, 248 Neb. 683, 695, 539 N.W.2d 18, 26 (1995), quoting *Oliver v. United States*, 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 2d 214

(1984). The boarding of two horses at an abandoned farmstead for a dollar clearly is not the sort of intimate activity sheltered by the Fourth Amendment. To put it another way, the search is not unreasonable and does not require a warrant. Therefore, Cheryl did not have standing to challenge the search of the farmstead.

Cheryl argues that the warrantless seizure of Ace and Moon was illegal, in violation of Neb. Rev. Stat. § 28-1012(1) (Cum. Supp. 2004), which states: "Any law enforcement officer who has reason to believe that an animal has been abandoned or is being cruelly neglected or cruelly mistreated may seek a warrant authorizing entry upon private property to inspect, care for, or impound the animal." However, the statute only says "may" seek a warrant, and Cheryl cites no authority that this statute either imposes a higher standard on law enforcement officers than is otherwise established by longstanding principles of search and seizure or makes it mandatory that a warrant be secured. And, we can think of no reason why the statute would do so. Thus, we read "may seek" as purely discretionary and as not effecting other doctrines of search and seizure, such as the plain view doctrine.

A warrantless seizure is justified under the plain view doctrine if (1) a law enforcement officer has a legal right to be in the place from which the object subject to the seizure could be plainly viewed, (2) the seized object's incriminating nature is immediately apparent, and (3) the officer has a lawful right of access to the seized object itself. *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003). In the instant case, the record shows that all three criteria of the plain view doctrine are undisputedly established. Cheryl did not have standing to challenge law enforcement's presence at the farmstead, for the reasons previously stated in this opinion. And, once the officers were at the farmstead, Ace and Moon were in plain view and the "incriminating nature" was immediately apparent, given the poor condition of the horses at the time; plus, the horses appeared to be abandoned. Finally, the officers had a "lawful right of access" to Ace and Moon, since the horses were essentially in an open field. Therefore, the search and seizure was not unreasonable and Cheryl's Fourth Amendment rights were not violated. Thus, the trial court properly denied her motion to suppress evidence relating to the search and seizure of Ace and Moon.

*Restitution.*

Cheryl argues that the trial court failed to consider her ability to pay when ordering her to make monetary payments to Siouxland Rescue and to Lown. However, Cheryl's argument rests upon Neb. Rev. Stat. §§ 29-2280 and 29-2281 (Reissue 1995), which deal with restitution. Section 29-2281 provides that restitution is "based on the actual damages sustained by the victim." Here, the horses were the victims, but they were not damaged—at least in the sense that they incurred monetary damages for which restitution can be made to them. Thus, the authority cited by Cheryl concerning a defendant's ability to pay restitution, e.g., *State v. Wells*, 257 Neb. 332, 598 N.W.2d 30 (1999), is not on point, since such authority rests on the explicit language of § 29-2281 requiring the court to "consider the defendant's earning ability, employment status, financial resources, and family or other legal obligations and [to] balance such considerations against the obligation to the victim." From this statutory language, the rule has evolved that the sentencing court must give "meaningful consideration" to the defendant's ability to pay restitution. See *State v. Wells*, 257 Neb. at 343, 598 N.W.2d at 38.

The State's argument that the county court's order of "restitution" is really "reimbursement," citing Neb. Rev. Stat. § 28-1006 (Cum. Supp. 2004), is partially correct. Section 28-1006 does allow for "reimbursement" for care associated with seized animals involved in any violation of Neb. Rev. Stat. § 28-1005 (Cum. Supp. 2004), a statute prohibiting dogfighting, cockfighting, bearbaiting, or pitting an animal against another. However, none of that is involved here. The applicable statute dealing with "reimbursement" in this case is Neb. Rev. Stat. § 28-1011 (Cum. Supp. 2004), which deals with violations of Neb. Rev. Stat. § 28-1009 (Cum. Supp. 2004), animal cruelty and neglect—the statute under which Cheryl was convicted.

Section 28-1011(1) states:

In addition to any other sentence given for a violation of section 28-1009 or 28-1010, the sentencing court may order the defendant to reimburse a public or private agency for expenses incurred in conjunction with the care, impoundment, or disposal of an animal involved in the violation of

such section. Whenever the court believes that such reimbursement may be a proper sentence or the prosecuting attorney requests, the court shall order that the presentence investigation report include documentation regarding the nature and amount of the expenses incurred. The court may order that reimbursement be made immediately, in specified installments, or within a specified period of time, not to exceed five years after the date of judgment.

Furthermore, unlike the restitution statute, this statute does not provide that before making reimbursement part of a sentence, the trial court must consider the defendant's ability to pay. Therefore, we reject this argument as a basis for reversing the reimbursement order. However, we now turn to the matter of the amount Cheryl is required to reimburse Siouxland Rescue and Lown.

*Order Nunc Pro Tunc.*

Cheryl argues that the county court erred in changing the reimbursement order in its order nunc pro tunc after the judge had announced sentence in open court. At the sentencing hearing, the judge ordered Cheryl to pay restitution to Siouxland Rescue and to Lown in the total amount of $2,112.27, although the judge also stated in reference to the amount that it could be inaccurate and that if so, he would correct it by an order nunc pro tunc. The court's journal entry dated July 8, 2004, also required reimbursement, except that it showed Cheryl was to pay $1,202.27 for the benefit of Siouxland Rescue and Lown, without specifying any amount per payee. On July 15, the court entered a nunc pro tunc order which stated that "due to [a] scrivener's error while calculating the expenses incurred in th[is] matter during the sentencing hearing of July 8, 2004, the correct total amount of restitution to be paid by [Cheryl] is $1,889.27; $885.80 to Siouxland . . . Rescue . . . and $1,003.47 to . . . Lown."

Before the entry of the nunc pro tunc order, on July 8, 2004, Cheryl filed her "Notice of Intention to Prosecute Appeal" to the district court for Thurston County. Neb. Rev. Stat. § 25-2001(3) (Cum. Supp. 2004) states:

Clerical mistakes in judgments, orders, or other parts of the record and errors therein arising from oversight or omission

*may be corrected by the court by an order nunc pro tunc at any time on the court's initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the case is submitted for decision in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.*

(Emphasis supplied.) This statute also applies to the county court. See Neb. Rev. Stat. § 25-2009 (Reissue 1995) (provisions of chapter 25 of Nebraska Revised Statutes shall apply to Supreme Court and county court, so far as same may be applicable to judgments or final orders of such courts).

While Cheryl filed her notice of appeal to the district court on July 8, 2004, the matter was not submitted to the district court for decision until after the hearing on September 14. Thus, under § 25-2001, the county court had jurisdiction to enter the order nunc pro tunc. Therefore, the district court improperly vacated the county court's order nunc pro tunc dated July 15, 2004, and although Cheryl's assignments of error do not attack the district court's action in this regard, we deal with it under the plain error doctrine. See *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003) (plain error will be noted only where error is evident from record, prejudicially affects substantial right of litigant, and is of such nature that to leave it uncorrected would cause miscarriage of justice or result in damage to integrity, reputation, and fairness of judicial process).

Thus, we reject's Cheryl's core argument to this court that the county court improperly changed the sentence pronounced in open court. It is clear that a criminal sentence can be corrected by an order nunc pro tunc, see *State v. Kortum*, 176 Neb. 108, 125 N.W.2d 196 (1963), thus disposing of Cheryl's assignment of error that the county court erred in changing the sentence it had announced in open court. Cheryl cites *State v. Campbell*, 247 Neb. 517, 527 N.W.2d 868 (1995), for the proposition that when the sentencing court delays deciding the amount of restitution and an appeal is filed, the sentencing court is without jurisdiction to later order restitution. However, the *Campbell* court's finding of a lack of jurisdiction was in a case where the trial court did not pronounce one amount and then change it to

another, as here, but completely delayed the hearing on the amount of restitution until after the defendant was released from incarceration. *Campbell* does not mention § 25-2001, and in any event, *Campbell* is obviously factually distinguishable from the present situation. Because the district court committed plain error in vacating the county court's nunc pro tunc order, the nunc pro tunc order of July 15, 2004, is the operative order on the matter of reimbursement by Cheryl. However, we still have before us Cheryl's assignment of error that the amount ordered to be paid was "erroneous and excessive."

The record made at the sentencing hearing coupled with the two bills included in the presentence investigation report leave the correct amount of the reimbursement hopelessly muddled. Clearly, the purpose of § 28-1011 is to ensure the reimbursement for *all* expenses incurred by parties such as Siouxland Rescue and Lown, whether as part of the sentence or by civil liability. See § 28-1011(2) ("[e]ven if reimbursement for expenses is not ordered under subsection (1) of this section, the defendant shall be liable for all expenses incurred by a public or private agency in conjunction with the care, impoundment, or disposal of an animal. The expenses shall be a lien upon the animal"). The order nunc pro tunc does not match the bills included in the presentence investigation report, neither Lown nor anyone from Siouxland Rescue testified at sentencing, and the record shows that horses other than Dee, Ace, and Moon were cared for—but the record did not contain evidence that the bills included in the presentence investigation report were solely related to the three horses involved in the convictions, and the care of only these three animals could be involved in the reimbursement portion of the sentence under § 28-1011(1). Therefore, we remand this cause to the district court with direction that it remand the matter to the county court for a determination of the amount of reimbursement owed by Cheryl to Siouxland Rescue and to Lown.

*Excessive Sentence.*

Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion. *State v. Segura*, 265 Neb. 903, 660 N.W.2d 512 (2003). The possible penalty for cruelty to animals

is imprisonment for up to 1 year, a $1,000 fine, or both; the possible penalty for each count of animal neglect is imprisonment for a period of up to 6 months, a $1,000 fine, or both. The trial judge sentenced Cheryl to 240 days in jail for the cruelty conviction and 90 days in jail for each of the two neglect convictions, with the sentences to be served consecutively.

In determining Cheryl's sentence, the trial judge considered the presentence investigation and Cheryl's family situation. The trial judge also noted that in 1991, Cheryl was convicted of 11 counts of similar types of crimes involving puppies and kittens. (The presentence investigation report reflects that Cheryl was convicted of 11 counts of cruelty to animals, was placed on probation for 2 years, and was ordered not to have more than one dog and one cat on her property during the probation period.) And, the judge thought it appeared likely that Cheryl would commit a similar crime in the future. The judge found that probation was not appropriate in this case and that a lesser sentence than incarceration would depreciate the seriousness of the crime and would promote disrespect for the law. The judge also noted that he was not in agreement with the sentencing recommendations of the county attorney, because the recommendations were far too minimal for what had occurred in the instant case, although such recommendations are not in our record. It is well known that reduction of statutorily authorized sentences by the Nebraska appellate courts is an infrequent occurrence. The sentence is within the statutory limits, and therefore, the trial court did not abuse its discretion.

## CONCLUSION

For the reasons stated above, we find that the county court properly denied Cheryl's motion to suppress evidence. We find that Cheryl's jail sentences were not excessive, and we affirm such sentences. We also affirm the decision of the county court ordering Cheryl to reimburse Siouxland Rescue and Lown for expenses incurred in conjunction with the care, impoundment, or disposal of the horses at issue in the instant case—Dee, Moon, and Ace. We find that the district court committed plain error when it vacated the county court's order nunc pro tunc dated July 15, 2004, since the county court did have jurisdiction

to enter such order. However, remembering that the county court has ordered three different amounts of reimbursement and that the presentence investigation report and sentencing hearing are insufficient to establish what the reimbursement by Cheryl really should be, we remand the cause to the district court with directions for it to remand the matter to the county court to hold such proceedings as are necessary as to make an accurate determination of the amount of reimbursement owed by Cheryl to Siouxland Rescue and Lown and to enter the corresponding order.

AFFIRMED IN PART, AND IN PART REMANDED
FOR FURTHER PROCEEDINGS.