275 Neb. 462
IVAN EICHER AND DELORES EICHER ET AL., APPELLEES,
v.
MID AMERICA FINANCIAL INVESTMENT CORPORATION ET AL., APPELLANTS.
No. S-06-1206.
Supreme Court of Nebraska.
Filed April 18, 2008.
David A. Domina and Elias T. Xenos, of Domina Law Group, P.C., L.L.O., for appellants.
Mark C. Laughlin, Andrea F. Scioli, and Tamara D. Borer, of Fraser Stryker, P.C., L.L.O., for appellees.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
HEAVICAN, C.J.

I. INTRODUCTION
William Street and David Welton, along with 11 other home mortgagors (collectively plaintiffs), brought various claims against Mid America Financial Investment Corporation (Mid America), Scott Bloemer, and Elaina Hollingshead (collectively defendants) in the district court for Douglas County. The district court found that defendants were liable to all the mortgagors except Welton and Street. The court found that Welton suffered no damage as a result of defendants' misconduct and that Street's claims were barred entirely by collateral estoppel. On appeal, we upheld the district court's findings regarding the other plaintiffs, but reversed the district court's determinations and remanded the cause regarding Street and Welton[1] On remand, the court ruled in favor of both Street and Welton, awarding each damages, attorney fees, and costs. Defendants now appeal, and for reasons set forth below, we affirm.

II. BACKGROUND
In May 2001, Street, Welton, and numerous other individuals sued defendants based on an allegedly deceptive scheme to defraud homeowners out of their homes. Using Mid America as their alter ego, Bloemer and Hollingshead would contact homeowners facing imminent foreclosures and offer to help the homeowners by loaning them the money needed to avoid foreclosure. However, under the terms of the forms Bloemer and Hollingshead encouraged the homeowners to sign, Mid America would acquire title to the homes by warranty deed. When the homeowners would fail to make the scheduled payments to Mid America, defendants would evict the homeowners. As a result, the homeowners lost their homes and any equity they had therein.
After a bench trial, the district court found that defendants had engaged in a civil conspiracy to defraud plaintiffs out of their homes and that this conduct violated Nebraska's Consumer Protection Act (CPA). Accordingly, the district court entered judgments in favor of plaintiffs, but specifically denied relief to Welton and Street for the reasons set forth above.
On appeal, we affirmed the district court's judgment regarding plaintiffs' claims of civil conspiracy and violations of the CPA. However, we reversed the district court's decision to dismiss Street's claims and remanded the cause with directions to adjudicate the merits of those claims. We also reversed the district court's finding that Welton did not suffer damages and remanded the cause with directions "to award damages to Welton in an amount which it shall determine from the existing record."[2]
On remand, the district court found that Welton was entitled to $35,532.40 in damages. The court based this figure on Welton's testimony that the fair market value of his property was $80,000 at the time of the Mid America transaction. The balance on the mortgage at the time was $41,000, which left Welton with $39,000 in equity in the home. The court found that Mid America paid a mortgage reinstatement fee of $5,947.80 and made $13,029.92 in mortgage payments for a total of $18,977.72. However, Welton made $15,330.12 in "loan" payments to Mid America, leaving Mid America with an interest of only $3,647.60 in the home. Accordingly, the court awarded Welton $35,532.40 in damages.
In that same order, the court also awarded Welton attorney fees in the amount of $12,108.20 and cited Neb. Rev. Stat. § 87-303 (Reissue 1999) as the basis for that award. It is worth noting at this juncture that § 87-303 pertains to Nebraska's Uniform Deceptive Trade Practices Act (UDTPA), yet Welton's judgment was based on the CPA.
Regarding Street, the district court found that he, too, was the victim of a civil conspiracy to commit fraudulent misrepresentation as well as violations of the CPA. The court calculated Street's damages at $35,478.98. This figure was based on Street's testimony that his home had a fair market value of $75,000 at the time of the Mid America transaction. Mid America paid $5,260.95 to reinstate the mortgage and $35,910.07 in mortgage payments for a total of $41,171.02. The court found that Street made one "loan" payment to Mid America of $800. The court also found that Street incurred $850 in damages when he was forced to move his family into a motel for a 17-day period after Mid America evicted him and his family.
As with Welton, the court awarded Street $12,108.20 in attorney fees. Once again, the court based the award on § 87-303, a section pertaining to the UDTPA, despite the fact that Street, like Welton, secured relief under the CPA.
Defendants filed notice of appeal on October 26, 2006, and submitted their opening brief on January 16, 2007. Shortly thereafter, the district court recognized that it mistakenly cited a section of the UDTPA rather than the CPA as the basis for Welton and Street's attorney fee awards. Accordingly, on January 26, 2007, the district court issued a pair of orders nunc pro tunc explaining its mistake and making clear that attorney fees were awarded under the CPA.

III. ASSIGNMENTS OF ERROR

1. ASSIGNMENTS REGARDING WELTON
Regarding Welton, defendants assign, restated and renumbered, that the district court erred (1) by miscalculating the amount of Welton's damages and (2) in awarding Welton attorney fees.

2. ASSIGNMENTS REGARDING STREET
Regarding Street, defendants assign, restated and renumbered, that the district court erred by finding that (1) defendants' transaction with Street violated the CPA, (2) Street successfully proved a case of fraudulent misrepresentation, (3) a civil conspiracy existed on the part of Bloemer and Hollingshead, and (4) Street was entitled to attorney fees.

IV. STANDARD OF REVIEW
[1-3] In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony.[3] An appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error.[4] Similarly, the trial court's factual findings in a bench trial of an action at law have the effect of a jury verdict and will not be set aside unless clearly erroneous.[5]
[4,5] In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.[6] When an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent, correct conclusion irrespective of the determination made by the court below.[7]
[6] The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved.[8]

V. ANALYSIS

1. WELTON JUDGMENT
Defendants raise two arguments regarding the judgment in favor of Welton. First, defendants argue that the district court erred in calculating the amount of Welton's damages. Second, defendants claim that the district court's award of attorney fees should not stand because the original basis for the awardthe UDTPAwas erroneous and the court's attempt to change that mistake through an order nunc pro tunc was invalid. We address each argument in turn.

(a) Damage Computation
Defendants argue that the district court made two errors when calculating Welton's damages. First, they claim that the district court neglected to credit them with the value of the repairs they made to Welton's home. Second, defendants claim that the district court erred in identifying the fair market value of Welton's home at the time of the transaction with Mid America.

(i) Repairs
Our review of defendants' argument that the district court did not properly credit them for repairs made to Welton's home is hamstrung by their failure to adequately develop that claim. Defendants simply assert that they were not given adequate credit for the repairs even though "[t]he trial court knew from the uncontroverted evidence, admitted by Welton, that his property was improved by [defendants]."[9] This assertion, however, is not accompanied by any cite to the record, nor do defendants specify the exact repairs to which they refer.
The district court's order may provide a clue as to the repairs at issue. In its order, the court discussed repairs made to the sidewalk in front of Welton's home. The court found that defendants did, in fact, spend roughly $2,000 to have a third party deliver and pour cement in front of Welton's home. But the district court also found that Welton had to remove the old sidewalk and set the forms in which the new cement was poured.
Because both parties contributed to those repairs through money or labor, the district court declined to credit either party with the value of those improvements. Defendants have not pointed to any evidence in the record which would undermine Welton's testimony or the significance that the district court attached to it. Accordingly, this argument is without merit.

(ii) Valuation of Welton's Home
Defendants next argue that the court erred when it concluded that Welton's home had a fair market value of $80,000 at the time of the Mid America transaction. Instead, defendants believe the home was worth no more than $65,000.
The district court drew the $80,000 figure from Welton's own testimony. Defendants' $65,000 figure is drawn from the testimony of Bloemer, one of the defendants in this case. Apparently, Bloemer has some expertise in real estate. Defendants believe, therefore, that the district court should have relied on his appraisal rather than that of Welton, a lay witness without significant knowledge about real estate.
[7] But we have long held that a landowner is qualified to testify to the fair market value of his or her own property.[10] And while testimony of an expert in real estate may sometimes be more reliable regarding the value of property than testimony from a lay witness, that would not be true where the trial court had reason to doubt the expert's credibility. The district court specifically found that Bloemer was not credible. Any additional skill that Bloemer had in identifying property values was rendered moot as a result. We cannot reassess the credibility of witnesses on appeal[11] and therefore conclude that defendants' argument in this regard is without merit.

(b) Attorney Fees
In defendants' opening brief filed with this court on January 16, 2007, they argued that Welton's attorney fee award was not valid because it was based on the UDTPA, while Welton's judgment was based on the CPA. However, on January 26, 2007, the district court issued an order nunc pro tunc, pursuant to Neb. Rev. Stat. § 25-2001(3) (Cum. Supp. 2006). In that order, the court explained that it had accidentally cited the UDTPA when it awarded Welton attorney fees. The court made clear that it had intended to cite to the CPA instead.
In response, defendants contend that the order nunc pro tunc is not valid and that Welton's attorney fee award must be reversed. Defendants' arguments in this regard are twofold. First, defendants believe the timeframe for issuing an order nunc pro tunc under § 25-2001(3) had lapsed before the court actually issued the order. Second, defendants argue that the defect in the original order was not a true "clerical error" and therefore not the sort of error correctable under § 25-2001(3). We address each argument in turn below.

(i) Timing
Defendants point out that a district court's ability to make subsequent changes to orders after they have been issued diminishes considerably when the term in which the order was issued has ended.[12] A district court's term coincides with the calendar year.[13] The district court's order nunc pro tunc was issued January 26, 2007, and attempts to correct an error in an order issued September 29, 2006.
[8] Nonetheless, defendants mischaracterize the scope of a district court's authority in this regard. A district court's authority to modify prior orders does not end entirely with the conclusion of the term. Rather, what ends at the conclusion of the term is the district court's virtually unlimited ability to modify orders issued therein.[14] Thereafter, a district court can modify a judgment or order issued in a prior term only if it has specific statutory authority to do so. The various scenarios enumerated in § 25-2001including § 25-2001(3)provide such authority.[15]
Even assuming § 25-2001(3) allowed the district court to correct an order issued in the prior term, defendants contend that the district court did not follow the timing requirements in that section. Section 25-2001(3) provides, in pertinent part, "During the pendency of an appeal, [clerical] mistakes may be so corrected before the case is submitted for decision in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court."[16]
To define "pendency" and "submitted for decision," defendants rely on Neb. Rev. Stat. § 25-1912(4) (Cum. Supp. 2006). That section provides that a district court is divested of jurisdiction when a party perfects an appeal by filing notice of that appeal in the district court. At that time, jurisdiction shifts from the district court to the appellate court. In so arguing, defendants suggest that "pendency" and "submitted for decision" are synonymous with filing notice of appeal. Accordingly, defendants essentially contend that any orders pursuant to § 25-2001(3) which come after notice of appeal has been filed would be void unless the district court obtained leave of the appellate court. Because the district court did not obtain leave from this court when it issued its order nunc pro tunc, the order would be void under defendants' reading of § 25-2001(3).
[9,10] But defendants' interpretation of § 25-2001(3) is foreclosed by the fact that § 25-2001(3) very clearly contemplates two distinct periods during the appellate process. In our view, "pendency" in § 25-2001(3) refers to the period of time after notice of appeal has been filed but before the parties have submitted the case at argument. "[S]ubmitted for decision" refers, therefore, to the period after the case was submitted at oral argument but before the court's opinion has issued.
[11] Under § 25-2001(3), a district court may freely correct clerical errors after notice of appeal has been filed up until the time the parties submit the case at the conclusion of arguments. After that time, the district court must obtain leave of the appellate court to fix a clerical error in a prior order. It is worth noting that the Court of Appeals has already interpreted and applied § 25-2001(3) in this fashion.[17]
Because this case had not yet been submitted when the district court attempted to correct the mistake in Welton's attorney fee award by issuing an order nunc pro tunc, the district court did not need leave from this court to issue that order. Therefore, assuming that the court's order nunc pro tunc concerns a clerical error in its prior order, the order was valid. The next question, then, is whether the district court's accidental citation to the UDTPA instead of the CPA can be characterized as a "clerical error."

(ii) Nature of District Court's Original Error
Defendants claim that the district court's citation to the UDTPA instead of the CPA is not a true clerical error and, therefore, that § 25-2001(3) does not permit the order nunc pro tunc. The district court itself explained that it "mistakenly" cited the UDTPA in its prior order through "oversight." This explanation finds support in the fact that the court made the exact same mistake in the original judgment that we affirmed on the first appeal in this case.
In the initial order following the first trial of this case, the district court awarded attorney fees under the CPA. "However, in its order following the subsequent hearing, the court referred to a provision in the UDTPA which permits an award of attorney fees to a prevailing party."[18] Then, while the parties were submitting their briefs in the first appeal in this case, the district court issued "an order nunc pro tunc declaring that the award of attorney fees was pursuant to the CPA and that the reference to the UDTPA was a clerical error."[19] A nearly identical sequence of events occurred before and during the present appeal. It seems doubtful that the district court wanted to incite another "confusing sequence of events"[20] by intentionally referring to the UDTPA a second time.
Nor do we think it significant that the court did not specifically refer to its error as a "clerical error." Such errors are defined as errors which result "from a minor mistake or inadvertence" especially in "writing or copying something."[21] There is perhaps no better description of what transpired here than that. Accordingly, we conclude that the reference to the UDTPA in Welton's attorney fee award was the product of a clerical error and that the court had authority to change it pursuant to § 25-2001(3).

2. STREET JUDGMENT

(a) CPA Violation
[12] Regarding Street, defendants first argue that the district court erred in finding that any misconduct on their part amounted to a violation of the CPA. The CPA's scope is limited to "the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska."[22] Based on that language, we have held that the CPA only applies to unfair or deceptive practices which affect the "public interest."[23]
Drawing on that phrase, defendants contend that the CPA should not apply here because the transaction involved only Street and the named defendants, not the public at large. In this way, defendants believe this case is similar to Nelson v. Lusterstone Surfacing Co.[24] In Nelson, we held that the CPA did not apply to the allegedly fraudulent sale of a single Jeep vehicle between a corporation and a private citizen.
Notably, defendants made the exact same argument with respect to the other plaintiffs in this case during the first appeal. Although we did not elaborate on our rationale at the time, it is clear that we found defendants' CPA argument unavailing, since we concluded that "plaintiffs are entitled to recover their damages and attorney fees under their alternative theories of fraud and violation of the CPA."[25] We see no reason to alter that conclusion now.
Nor is it significant that Street's claim was litigated separately from the remainder of plaintiffs' claims. Street would have recovered along with those plaintiffs but for the district court's mistaken conclusion that his claim was procedurally barred. Street's claim depends on the same allegations raised by the other plaintiffsthat is, that defendants engaged in a pattern of calculated conduct intended to defraud numerous citizens of this state of their homes. We find no merit in defendants' contention that the CPA does not apply to their transaction with Street.

(b) Fraudulent Misrepresentation
[13] Defendants next argue that the district court erred in neglecting to recognize Street's failure to prove a case of fraudulent misrepresentation. To set forth a prima facie case of fraudulent misrepresentation, one must show (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that it should be relied upon; (5) that the party reasonably did so rely; and (6) that he or she suffered damage as a result.[26] Defendants believe that Street failed to prove several of these elements. We review each of defendants' arguments in the subsections that follow.

(i) Existence of False Statement of Fact
Street claimed at trial that defendants made numerous false statements that the transaction with Mid America was a loan and not a sale. Defendants point out, however, that the only real evidence of such statements is Street's own "self-serving" testimony.[27] But despite the potential for bias, the district court found that Street was a credible witness. Moreover, the only evidence that contradicts Street's testimony is testimony by Bloemer and Hollingshead, two of the defendants. This evidence carries the same potential for bias, and the district court specifically found that Bloemer and Hollingshead were not credible. The district court did not err in relying on Street's testimony regarding the existence of false factual statements.

(ii) Reasonable Reliance
[14,15] Defendants next suggest that Street did not reasonably rely on their false statements of fact because he signed forms which clearly indicated that the transaction was a sale, not a loan as Street claims he was told. But at trial, Street testified that he did not read the forms before signing them. The general rule that an individual's knowledge of a contract's contents is presumed once the individual signs it "applies only in the absence of fraud."[28] Or, as we said in the first appeal in this case,
"The doctrine that the carelessness or negligence of a party in signing a writing estops him from afterwards disputing the contents of such writing is not applicable in a suit thereon between the original parties thereto when the defense is that such writing, by reason of fraud, does not embrace the contract actually made."[29]
Because the district court specifically found that Street was fraudulently induced to sign the sale agreements with Mid America, he is not charged with constructive knowledge of their contents. Accordingly, it is irrelevant whether those agreements clearly identified the transaction as a sale.

(iii) Actual Reliance
Defendants next argue that even if it would have been reasonable for Street to rely on their false statements, there is proof that Street did not actually do so. In this regard, defendants point out that Street's home was listed as sold on his 1998 tax return. The desired inference is that Street knew his home had been sold and held it out as such.
However, Street testified at trial that he did not list the sale of his home on his tax return. Street first realized that his home was so listed when he reviewed the tax documents in May 2002 while preparing for trial. As Street explained, Mid America mailed him various tax-related documents early in 1999. Street apparently did not review these documents himself. Instead, Street took those and his other tax documents to a local office of "Professional Bookkeeping Service" (PBS) and asked them to prepare his tax return. When PBS completed Street's tax return, Street signed and mailed the return without reviewing it. Street also claims that he never spoke to any PBS employees about the contents of his tax return. Therefore, according to Street's testimony, he did not personally report the sale of his home on his 1998 tax return. The district court found Street to be a credible witness, and we cannot disturb that determination on appeal. Accordingly, the tax return does not support the inference that Street knew his transaction with Mid America was a sale and not a loan.

(iv) Causation
Defendants also contend that any fraud on their part did not cause Street to suffer damages because Street's home would have been foreclosed upon but for their intervention. In support of this argument, defendants offer Street's testimony wherein he concedes that he was not planning to take any steps to prevent foreclosure before Mid America contacted him. But the suggestion that Street's home would have been foreclosed without their intervention reflects a fundamental misunderstanding of the proper causal inquiry in this case.
Street has not alleged that Mid America caused him to lose his home. Rather, Street alleged that Mid America caused him to lose his home and any equity he had invested in it. As the district court found, Street's home had a fair market value of approximately $75,000, with $41,171.02 remaining on his mortgage. This left Street with $33,828.98 in equity in his home. Even a foreclosure of Street's home would have permitted him to recover some if not all of that equity. By fraudulently inducing Street to convey his home to them, Mid America caused Street to lose his home and as much as $33,828.98 in equity.

(v) Damages
Defendants' final argument regarding Street's claim of fraudulent misrepresentation concerns damages. First, defendants claim that the district court erred when it relied on Street's testimony on his home's fair market value. Second, defendants claim that Street did not prove his damages with sufficient specificity.
Defendants' first argument is identical to the argument they made regarding the district court's decision to base Welton's damages on Welton's assessment of the fair market value of his own home instead of Bloemer's testimony. Again, as a landowner, Streetlike Weltonwas qualified to testify as to the value of his property.[30] And while Bloemer may have had more knowledge of the real estate market, the court found that unlike Street, Bloemer was not trustworthy. Accordingly, the court did not err in relying on Street's testimony to identify the fair market value of Street's home.
[16] As for the second argument, defendants point out that Street did not show how much he would have received for his home at a foreclosure sale. As such, defendants contend that Street did not prove his damages with the degree of specificity that the law requires. But Nebraska law only requires a plaintiff to prove his or her damages to a reasonable certainty; it does not require proof beyond all reasonable doubt.[31] The district court's computation was a reasonable estimate of Street's damages based on the estimated value of his home, less the amount owed on his mortgage. This was the exact same method that we used in the first appeal of this case to speculate whether Welton had suffered any damages.[32] While it is true that Street did not prove that his home would have earned its full estimated value at the foreclosure sale, such proof is not needed to generate a reasonably certain estimate of his damages.

(c) Civil Conspiracy
[17] Defendants next contend that the district court erred in finding in favor of Street on his allegation of civil conspiracy. A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.[33] Defendants argue that Street's civil conspiracy claim was deficient in numerous respects.

(i) Underlying Civil Violation
[18] First, defendants argue that they cannot be held liable for a civil conspiracy because they did not commit any underlying violations. A civil conspiracy is only actionable if the alleged conspirators actually committed some underlying misconduct.[34] But as set forth above, we affirm the district court's conclusion that defendants violated the CPA and committed fraudulent misrepresentation. There are, therefore, multiple underlying violations to support a claim of civil conspiracy.

(ii) Specificity in Pleadings
[19] Defendants next argue that the district court erred in failing to recognize that Street did not properly allege a civil conspiracy. To pursue a claim of civil conspiracy where, as here, the allegations involve a conspiracy between the corporation and its corporate employees, the petition must allege that the latter are acting outside the scope of their authority or other than in the normal course of their corporate duties.[35] Defendants believe Street failed to do so in his pleadings and was therefore estopped from pursuing that claim at trial.
But the portion of Street's pleadings which set forth a claim of civil conspiracy is identical to the pleadings filed by each of the other plaintiffs in this case. In disposing of defendants' first appeal, we held that such language was "sufficient to set forth a claim of conspiracy among all three defendants."[36]
Defendants attempt to escape the force of that conclusion by arguing that it contradicts our decision in Upah v. Acona Bros. Co.[37] In Upah, we held that a plaintiff was estopped from pursuing a civil conspiracy claim due to a deficiency in the pleadings. But there is a notable difference between the pleadings at issue here and the pleadings in Upah.
In Upah, the pleadings alleged that defendants' wrongful actions "`were done within the scope of their corporate duties.'"[38] This presented an obvious problem because, as explained above, a claim of civil conspiracy requires exactly the oppositean allegation that defendants' wrongful actions were done outside the scope of their authority.[39] But the pleadings involved in this case do not present such an inherent contradiction. The pleadings here allege that Bloemer and Hollingshead used the Mid America corporate entity as their "alter ego" and a "conduit" through which they defrauded the homeowners. Such allegations are sufficient to support a claim of civil conspiracy.

(iii) Proof Defendants Acted Outside Scope of Their Corporate Duties
Defendants' final argument regarding Street's civil conspiracy claim is that the district court erred in finding that Bloemer and Hollingshead acted outside the scope of their corporate duties. Street's claim depends on the same evidence the trial court used to conclude that Bloemer and Hollingshead acted outside the scope of their corporate duties with respect to the other plaintiffs in this case. During the first appeal, we concluded that such evidence "supports the allegation that the individual defendants acted outside any legitimate scope of corporate employment by utilizing the corporate entity as part of a scheme to defraud third parties."[40] We see no reason to change that conclusion now.

(d) Attorney Fees
In their final assignment, defendants contend that the district court erred in awarding attorney fees to Street. As was true for Welton, the district court initially awarded Street attorney fees under the UDTPA, then issued an order nunc pro tunc clarifying that it meant to award attorney fees pursuant to the CPA. As noted above in our discussion of Welton's attorney fee award, the district court had authority to issue its orders nunc pro tunc under § 25-2001(3). The district court did not err in awarding attorney fees to Street.

VI. CONCLUSION
We conclude that the district court did not err in resolving Welton's claims. The court properly relied on Welton's testimony regarding his home's fair market value when setting the amount of his damages. Moreover, the district court provided an adequate basis for its award of attorney fees in a valid order nunc pro tunc.
We also conclude that the district court properly handled Street's claims on remand. As with the other plaintiffs in this case, the district court accurately concluded that defendants' actions amounted to a violation of the CPA. The district court did not err in finding that Street successfully proved a case of fraudulent misrepresentation. Similarly, the district court did not err in finding that defendants engaged in a civil conspiracy. The district court properly considered Street's testimony regarding his home's fair market value in calculating Street's damages. Finally, as with Welton, the district court provided a proper basis for Street's attorney fee award in a valid order nunc pro tunc.
Having concluded that the district court did not err in resolving either Welton's or Street's claims against defendants, we affirm the district court's judgment.
AFFIRMED.
NOTES
[1] Eicher v. Mid America Fin. Invest. Corp., 270 Neb. 370, 702 N.W.2d 792 (2005).
[2] at 390, 702 N.W.2d at 811.
[3] See Eicher, supra note 1.
[4] See id.
[5] See Broeketneier Ford v. Clatanoff, 240 Neb. 265, 481 N.W.2d 416 (1992).
[6] Id. See Eicher, supra note 1.
[7] v. American Employers Group, 268 Neb. 473, 684 N.W.2d 33 (2004).
[8] Bradley T & Donna T v. Central Catholic High Sch., 264 Neb. 951, 653 N.W.2d 813 (2002).
[9] Brief for appellants at 26.
[10] See Smith v. Papio-Missouri River NRD, 254 Neb. 405, 576 N.W.2d 797 (1998).
[11] supra note 1.
[12] See Emry v. American Honda Motor Co., 214 Neb. 435, 334 N.W.2d 786 (1983).
[13] See Hartman v. Hartman, 265 Neb. 515, 657 N.W.2d 646 (2003).
[14] First Nat. Bank v. First Trust Co., 145 Neb. 147, 15 N.W.2d 386 (1944).
[15] State ex rel. Ward v. Pape, 237 Neb. 283, 465 N.W.2d 760 (1991).
[16] 25-2001(3).
[17] State v. Zietnann, 14 Neb. App. 117, 705 N.W.2d 59 (2005).
[18] supra note 1, 270 Neb. at 382, 702 N.W.2d at 806.
[19] at 374, 702 N.W.2d at 801.
[20] at 382, 702 N.W.2d at 806.
[21] Law Dictionary 582 (8th ed. 2004).
[22] Rev. Stat. § 59-1601(2) (Reissue 2004).
[23] Nelson v. Lusterstone Surfacing Co., 258 Neb. 678, 683, 605 N.W.2d 136, 141 (2000).
[24] ">24.Id.
[25] supra note 1, 270 Neb. at 390, 702 N.W.2d at 811 (emphasis supplied).
[26] supra note 1 (citing Agri Affiliates, Inc. v. Bones, 265 Neb. 798, 660 N.W.2d 168 (2003)).
[27] Brief for appellants at 17.
[28] Eicher, supra note 1, 270 Neb. at 379, 702 N.W.2d at 804.
[29] Id. (quoting West v. Wegner, 172 Neb. 692, 111 N.W.2d 449 (1961)).
[30] Smith, supra note 10.
[31] Pribil v. Koinzan, 266 Neb. 222, 665 N.W.2d 567 (2003).
[32] Eicher, supra note 1.
[33] (citing Four R Cattle Co. v. Mullins, 253 Neb. 133, 570 N.W.2d 813 (1997)).
[34] Treptow Co. v. Duncan Aviation, Inc., 210 Neb. 72, 313 N.W.2d 224 (1981).
[35] Dixon v. Reconciliation, Inc., 206 Neb. 45, 291 N.W.2d 230 (1980).
[36] supra note 1, 270 Neb. at 381, 702 N.W.2d at 805.
[37] v. Ancona Bros. Co., 246 Neb. 585, 521 N.W.2d 895 (1994), disapproved in part on other grounds, Welsch v. Graves, 255 Neb. 62, 582 N.W.2d 312 (1998).
[38] at 592, 521 N.W.2d at 901 (emphasis supplied).
[39] supra note 1.
[40] at 381, 702 N.W.2d at 805.