IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

SJULIN V. SJULIN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RYAN SJULIN, APPELLANT,

V.

MICKALA SJULIN, APPELLEE.

Filed December 21, 2021.    No. A-21-318.

Appeal from the District Court for Otoe County: JULIE D. SMITH, Judge. Affirmed.

Ryan K. McIntosh, of Brandt, Horan, Hallstrom & Stilmock, for appellant.

Julie E. Bear, of Reinsch, Slattery, Bear, Minahan & Prickett, P.C., L.L.O., for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

RIEDMANN, Judge.

### INTRODUCTION

Ryan Sjulin appeals the amended decree entered by the district court for Otoe County, which dissolved his marriage to Mickala Sjulin, awarded custody and child support for their children, and divided the marital estate. Finding no abuse of discretion in the district court's decisions, we affirm.

### BACKGROUND

Ryan and Mickala were married in 1998. Their older child was born in 2003, and their younger child was born in in 2007. Ryan filed a complaint to dissolve the marriage in September 2019. The following month, the district court entered a temporary order awarding sole legal and physical custody of the children to Mickala and granting Ryan parenting time every other weekend and Tuesday evenings.

- 1 -

Prior to trial, Mickala submitted discovery requests to Ryan, and in his responses, he indicated that he would supplement certain responses. When he failed to do so by February 2020, Mickala filed a motion to compel his responses, seeking information related to certain business debts. A few days later, Ryan's counsel filed a motion to withdraw. The district court held a hearing on both motions in March. Ryan did not appear, and his counsel appeared telephonically. The court permitted his counsel to withdraw and granted Mickala's motion to compel, ordering Ryan to produce certain documents within 15 days of the entry of the order. It appears the order granting the motion to compel was sent to Ryan's counsel, who had been allowed to withdraw.

The following month, when Ryan had still not produced the ordered documents, Mickala filed a motion for sanctions. The certificate of service indicates that the motion and notice of hearing were sent to Ryan via two separate email addresses. Ryan did not appear at the hearing, and the court granted the motion, ordered Ryan to pay $500 in attorney fees for Mickala, and prohibited him from claiming that any of the debts listed in the order to compel were marital debts or introducing evidence of them at trial. Ryan appeared at trial in January 2021 and represented himself.

At the time of trial, Mickala had been employed as an educator for 22 years. She is an English teacher, the high ability learner facilitator, the drug education instructor, and the track coach. She works Monday through Friday, from 7:45 a.m. until 4 p.m.

Ryan studied landscape architecture in college and operated a landscaping business during the marriage. It was a family business that Ryan began operating in 1996; thus, he had more than 20 years' experience working as a landscape architect. His skill set involves planning, designing, installing, and maintaining landscaping, but because his business operates in a smaller town, in addition to landscaping work, his company also does concrete and other types of projects and snow removal in the winter. He employs both high school and adult workers, and he pays his adult employees $14 to $20 per hour, with the more skilled workers earning the higher pay. Mickala presented evidence from the Nebraska Department of Labor that the median annual salary for a landscape architect in Nebraska was $58,022.

The parties owned a marital home in Nebraska City, Nebraska. An appraisal completed in March 2020 valued the home at $190,000. Mickala testified at trial that she believed that figure to be the current fair market value of the home. In conjunction with the appraisal, Mickala refinanced the mortgage on the home and took out $30,000, which she used to replace part of the roof on the marital home, pay off the loan on her vehicle, and pay off marital credit card debt. The December 2020 mortgage statement showed a balance of $127,360.40.

After Ryan filed for divorce, Mickala and the children remained in the marital home, where each of the children has his own bedroom. Ryan moved out, and after renting part of a house for a few months, he moved to Hamburg, Iowa. Initially he lived in a camper parked near a cabin on land his family owns and near his grandparents' home. Once the weather turned cold, he moved into the cabin. Thus, at the time of trial, he was residing in a 900-square-foot cabin comprised of four rooms, including one bedroom with two beds. When the children had parenting time with Ryan, they spent most nights at their great-grandparents' home.

Around the spring or summer of 2020, the older child started spending additional time in Hamburg. He would stay at his great-grandparents' home, where he has his own bedroom, and acted as a caretaker for them. He continued to attend his senior year of high school in Nebraska

City, which was a 25 minute commute from Hamburg. He was tardy to school numerous times, particularly to his first period class. His teacher contacted Mickala in October 2020 with concerns about his frequent tardiness and said that the child appeared very tired at school and had commented to her that he "is more like the parent at home" and that he felt "like the roles [were] reversed." When Ryan was asked at trial what he had done to address the child's tardiness, he replied, "You know, it's going to be one of those things to where sometimes you have to be responsible for your own actions. I mean, the school is going to come down on him for that." The older child was set to graduate from high school a few months after trial and had plans to attend college in the fall of 2021 and live with friends.

Mickala testified that despite spending additional time in Hamburg, the older child continued to spend time at her house on a regular basis. She believed that awarding her sole legal and physical custody of both children was in their best interests because she has been their primary caregiver, and she believed that her background as a teacher allows her to assist the children with their academics and her work hours allow her time to be with them both after school and in the summertime.

Mickala also expressed concerns about the children's time with Ryan. She was concerned about a lack of supervision, explaining that they ride four-wheelers without helmets, driving fast and at times getting into accidents, and they are allowed to be on the lake without adult supervision. The lack of supervision scares her. She was additionally concerned about Ryan's temper and the way he disciplines the children. She claimed that the children walk on eggshells around him and that he has a history of raging, fighting, and physical violence.

Mickala had further concerns about Ryan's alcohol consumption. She claimed that Ryan drinks on a daily basis and has a history of drinking and driving with the children in the car. Moreover, he was taking the older child's ADHD medication on top of his own medication, such that the pharmacy ultimately would allow only Mickala, and not Ryan, to pick up the child's medication.

After trial was completed, the district court entered an amended decree. It found that both parties were fit parents but determined that awarding sole legal and physical custody of the children to Mickala was in the children's best interests. The court adopted the parenting plan Mickala proposed, which mirrored the parenting time arrangement provided in the temporary order.

The court found that Ryan worked as a landscape architect and was capable of earning $58,022 per year. The court recognized the fact that the older child would soon be graduating from high school and had been choosing to stay in Iowa and not with Mickala. And while it awarded legal and physical custody to Mickala, the court realized that the parties had not been following the temporary order containing the same terms and that the older child was a licensed driver. Therefore, in order to avoid an inequitable result for child support purposes, the court deviated from the child support guidelines and ordered Ryan to pay $505 per month for two children and the same amount for one child. Based on its pretrial discovery orders, the court found that certain debt was the nonmarital responsibility of Ryan. Mickala was awarded the marital home valued at $190,000 and its associated mortgage with a balance of $127,360.40. The rest of the marital estate was divided between the parties. Ryan appeals.

## ASSIGNMENTS OF ERROR

Ryan assigns, renumbered and summarized, that the district court erred in (1) awarding sole legal and physical custody to Mickala, (2) failing to use the split custody child support worksheet, (3) determining his earning capacity for purposes of calculating child support, (4) valuing the marital home and its mortgage, (5) prohibiting him from claiming business debts were marital and presenting any evidence at trial regarding such debts, and (6) determining that certain debts were nonmarital pursuant to the pretrial discovery orders.

## STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*. In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id*. However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id*. A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

## ANALYSIS

*Custody.*

Ryan assigns that the district court erred in awarding sole legal and physical custody of the children to Mickala. We find no abuse of discretion in the court's custody decision.

When custody of minor children is an issue in a proceeding to dissolve the marriage of the children's parents, custody is determined by parental fitness and the children's best interests. *Burcham v. Burcham*, 24 Neb. App. 323, 886 N.W.2d 536 (2016); Neb. Rev. Stat. § 42-364(2) (Cum. Supp. 2020). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Burcham v. Burcham, supra*. Because the district court found that Ryan and Mickala were both fit parents, a finding that Ryan does not challenge, we consider the children's best interests.

The best interests of a child require a parenting arrangement "for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress." Neb. Rev. Stat. § 43-2923(1) (Reissue 2016). The best interests of a child also require that

> the child's families and those serving in parenting roles remain appropriately active and involved in parenting with safe, appropriate, continuing quality contact between children and their families when they have shown the ability to act in the best interests of the child and have shared in the responsibilities of raising the child.

§ 43-2923(3). Section 43-2923(6) further provides:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member[;] and

(e) Credible evidence of child abuse or neglect or domestic partner abuse.

Here, at the time of trial, Mickala remained in the marital home, where each child has his own bedroom, and Ryan was residing in a camper and/or a 900-square-foot cabin, which has one bedroom with two beds. The parties agreed that around spring or summer 2020, the older child began spending additional time in Iowa. The majority of the time he is there, he is at his great-grandparents' home, not with Ryan. Mickala testified, however, that the older child continued to spend time at her house on a regular basis.

Mickala opined that awarding her sole legal and physical custody would be in the children's best interests because she has been their primary caregiver and has concerns when the children are with Ryan, including a lack of supervision, his temper, and his excessive drinking. She explained that Ryan has a history of violence and drinking and driving with the children in the car. He was also taking the older child's ADHD medication on top of his own medication.

Mickala expressed additional concern that the older child had been tardy to school on so many occasions while commuting from Hamburg to Nebraska City and that he told a teacher that he felt more like the parent at home and felt that he was raising himself. When asked about the child's tardiness, Ryan responded, "You know, it's going to be one of those things to where sometimes you have to be responsible for your own actions. I mean, the school is going to come down on him for that." Mickala further believed that her background as a teacher allows her to assist the children with their academics, and her work hours allow her time to be with them both after school and in the summers.

We understand Ryan's perspective that the older child was a senior in high school at the time of trial, a few months' shy of graduating, and regardless of the court's custody order, it would likely be difficult to require him to reside somewhere he did not want to be. And based on the evidence that he planned to attend college and live with friends after graduating high school and the timing of this opinion, it is likely that his primary residence is no longer with either parent. However, he has not yet reached the age of majority and the question before us is whether the district court abused its discretion in awarding custody of both children to Mickala. Given the evidence presented at trial and summarized above, we conclude that it did not.

We note that Mickala raises the issue of removal in her brief, noting that Ryan never requested permission to remove the children to Iowa. Having affirmed the district court's decision to award sole physical custody to Mickala, however, we need not address whether a removal analysis was necessary here. See *Rommers v. Rommers*, 22 Neb. App. 606, 858 N.W.2d 607 (2014)

(trial court should first enter order regarding custody and then conduct removal analysis, if necessary).

*Child Support.*

Ryan raises two issues related to child support. He claims that the district court erred in failing to use the split custody worksheet and that it erred in determining his earning capacity for purposes of calculating child support.

With regard to the appropriate child support worksheet, Ryan claims that using the split custody worksheet would recognize the contributions by the parties and the fact that the older child will not be returning to Mickala's home. Having affirmed the award of sole physical custody to Mickala above, we decline to find that using the sole custody worksheet was improper or remand the matter for recalculation of child support. We also note that the district court recognized that the parties had not been following the temporary custody order containing the same terms as those set forth in the decree and that the older child was a licensed driver. Therefore, in order to avoid an inequitable result for child support purposes, the court deviated from the child support guidelines and ordered Ryan to pay $505 per month for two children, which was the same amount he would pay for one child.

We also find no abuse of discretion in the earning capacity the court imputed to Ryan. In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015). The guidelines provide that if applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. *Id*. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources. *Id*. Use of earning capacity to calculate child support is useful when it appears that the parent is capable of earning more income than is presently being earned. *Id*. Generally, earning capacity should be used to determine a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts. *Id*.

In the present case, the record shows that Ryan went to community college where he studied landscape architecture and that he has been a landscape architect for more than 20 years. He operated a landscaping business during the marriage, and his skill set involves planning, designing, installing, and maintaining landscaping. In addition to landscaping work, his company also does concrete and other types of projects and snow removal in the winter.

The parties' 2017 and 2018 tax returns were received into evidence at trial, which include the landscaping business' income and expenses. However, Mickala testified that it was difficult to value Ryan's earnings based upon the tax returns and that it was common for him to receive payments in cash. On appeal, Ryan does not claim that the court erred in basing his income on earning capacity instead of actual earnings or that the court should have used the figures included on the tax returns as his income for child support purposes. Rather, he asks that we remand the matter to the district court with instructions to determine his actual earning capacity.

There was little evidence presented at trial related to Ryan's income. He testified that his landscaping crew includes both high school and adult workers and that he pays his adult employees $14 to $20 per hour, with the more skilled workers earning $20. He questioned Mickala as to difficulties the landscaping business experienced in 2011, but she also testified that it was "pretty

rare" that they struggled financially, explaining to him, "You did well. You did very well." She acknowledged, however, that they lived beyond their means during their marriage and that there were months where they struggled a bit for money. In his own testimony, Ryan claimed that he was "not going to do landscaping anymore." He did not elaborate on any future employment plans.

Based on the foregoing, we find no abuse of discretion in the court's decision regarding Ryan's earning capacity. He has more than 20 years' experience in the landscaping business. He pays his experienced workers $20 per hour, which equates to an annual salary of $41,600 for full-time work. According to Mickala, the parties' tax returns are not an accurate representation of Ryan's earnings, it was not uncommon for him to receive cash payments, and the business did "very well." The limited evidence related to income that was presented to the court established that the median annual income in Nebraska for a landscape architect was $58,022. We therefore affirm the decision to impute to Ryan an annual income of $58,022.

*Marital Home.*

Ryan asserts that the district court erred in its valuation of the marital home and its mortgage. We disagree.

Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Rohde v. Rohde*, 303 Neb. 85, 927 N.W.2d 37 (2019).

The issue before us concerns the second step of the process, the proper valuation of the marital home and its mortgage. Ryan argues that the appraisal of the home, upon which the district court based its valuation, was completed before Mickala refinanced the mortgage and had the roof repaired and that the district court's decision accounted for neither the $30,000 in cash nor the increased value of the home.

With respect to the value of the home, Ryan's assertion that replacing part of the roof increased its value is speculative, because he did not introduce any evidence as to the value of the home after the roof repair was complete. And neither party was asked whether the improvements to the roof increased its value. To the contrary, Mickala opined that $190,000 remained the current fair market value at the time of trial. A landowner is qualified to testify to the fair market value of his or her own property. *Eicher v. Mid America Fin. Invest. Corp.*, 275 Neb. 462, 748 N.W.2d 1 (2008). The district court, therefore, did not abuse its discretion in determining that the home's value was $190,000.

As to the $30,000, Mickala explained that in addition to the roof repair, she used the money to pay off marital debt including credit cards and her vehicle's loan. The mortgage statement introduced at trial was dated December 2020 and, thus, accounted for the $30,000 increase in the balance. Therefore, the total balance of the marital debt remained the same, but instead of owing more on credit cards and a vehicle loan, the debt shifted to the mortgage. As such, we reject Ryan's argument that the district court's valuations failed to properly account for the roof repair and the mortgage refinance.

*Discovery Sanction Related to Business Debts.*

Ryan asserts that the district court abused its discretion in prohibiting him from claiming that his business debts were marital and preventing him from presenting any evidence at trial regarding such debts. The court's order was the result of Ryan's failure to respond to discovery and to a motion to compel and was thus entered as a discovery sanction pursuant to Neb. Ct. R. Disc. § 6-337.

The main purpose of the discovery process is to narrow the factual issues in controversy so that the trial is efficient and economical. *Hill v. Tevogt*, 293 Neb. 429, 879 N.W.2d 369 (2016). The discovery process helps the litigants conduct an informed cross-examination and avoid tactical surprise, a circumstance which might lead to a result based more on legal maneuvering than on the merits of the case. *Id*.

If the parties fall short of their discovery obligations, § 6-337 allows the court to sanction them. *Hill v. Tevogt, supra.* Section 6-337 provides that if a party fails to obey an order to provide or permit discovery, the court in which the action is pending may make such orders in regard to the failure as are just, including an order prohibiting the disobedient party from introducing designated matters in evidence. § 6-337(b)(2)(B).

Sanctions under § 6-337 exist not only to punish those whose conduct warrants a sanction but to deter those, whether a litigant or counsel, who might be inclined or tempted to frustrate the discovery process by their ignorance, neglect, indifference, arrogance, or, much worse, sharp practice adversely affecting a fair determination of a litigant's rights or liabilities. *Eddy v. Builders Supply Co.*, 304 Neb. 804, 937 N.W.2d 198 (2020). An appropriate sanction under § 6-337 is determined in the factual context of a particular case and is initially left to the discretion of the trial court, whose ruling on a request for sanction or a sanction imposed will be upheld in the absence of an abuse of discretion. *Eddy v. Builders Supply Co., supra.* Even if the court imposes a discovery sanction that amounts to a "death sentence," we review the court's decision for an abuse of discretion. *Hill v. Tevogt*, 293 Neb. at 436, 879 N.W.2d at 374.

The appropriate sanction under § 6-337 depends on the facts. *Hill v. Tevogt, supra*. Relevant factors include the prejudice or unfair surprise suffered by the party seeking sanctions, the importance of the evidence which is the root of the misconduct, whether the court warned the sanctioned party about the consequences of its misconduct, whether the court considered less drastic sanctions, the sanctioned party's history of discovery abuse, and whether the sanctioned party acted willfully or in bad faith. *Id*.

In the present case, Ryan argues that he did not receive notices related to this discovery matter. While the record indicates that the original order granting Mickala's motion to compel was sent to Ryan's counsel who had been given leave to withdraw, Mickala's motion for sanctions and notice of hearing were served on Ryan at two separate email addresses. So regardless of whether Ryan received notice of the order compelling him to produce certain documents, he was served with the subsequent motion for sanctions. He failed to appear at the hearing, and the order granting the motion was mailed to Ryan at the marital home. He acknowledged in his testimony at trial that he did not change his address with the court from the marital home to his residence in Iowa. We recognize that after Ryan's counsel withdrew in March 2020, he proceeded pro se throughout the duration of the proceedings. However, a pro se litigant is held to the same standards as one who is

represented by counsel. See *Friedman v. Friedman*, 290 Neb. 973, 863 N.W.2d 153 (2015). Thus, he was required to personally complete tasks that counsel would typically handle such as respond to discovery, follow court orders, and communicate with Mickala's counsel and the court.

At the hearing on the motion for sanctions, Mickala asserted that the discovery had initially been served on Ryan in September 2019, and therefore at that point, it had been 7 months and she had yet to receive responses. Ryan initially responded to the discovery in December, but indicated that he would supplement his responses related to business debts. Allowing Ryan to present evidence at trial that he failed to disclose to Mickala in discovery would have resulted in prejudice or unfair surprise to her. In a hierarchy of harshness, the exclusion of evidence lies somewhere between the payment of expenses caused by the misconduct and dismissal or default judgment. *Hill v. Tevogt*, 293 Neb. 429, 879 N.W.2d 369 (2016). We find no abuse of discretion in the court's decision to exclude evidence of business debt at trial as a discovery sanction when the information was never disclosed to Mickala prior to trial. Based on our resolution of this issue, we need not address Ryan's other assigned errors claiming that the district court erred in determining that his business debts were nonmarital property pursuant to the pretrial discovery orders.

CONCLUSION

We find no abuse of discretion in the district court's decisions relating to custody of the parties' children, child support, valuation of the marital home, or discovery sanctions. We therefore affirm.

AFFIRMED.